IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT C. SMITH, | ) | Case No. 5:17-CV-2666 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.       Introduction

Plaintiff, Robert C. Smith, seeks judicial review of the final decision of the

Commissioner of Social Security denying his application for supplemental security income under

Title XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C.

§§ 405(g),1383(c)(3), and Local Rule 72.2(b).  Because the ALJ applied proper legal standards

and reached a decision supported by substantial evidence, I recommend that the Commissioner's

final decision denying Smith's application for supplemental security income be affirmed.

## II.      Procedural History

On October 23, 2014, Smith applied for supplemental security income.  (Tr. 148–56)

Smith alleged that he became disabled on March 23, 2014, due to a stroke, brain tumor, high

blood pressure, and thyroid issues.  (Tr. 59, 78, 148)  The Social Security Administration denied

Smith's application initially and upon reconsideration.  (Tr. 59–76, 78–94)  Smith requested an

administrative hearing.  (Tr. 145–47)  Administrative Law Judge ("ALJ") Charles Shinn heard

Smith's case on February 16, 2017, and denied the claim in a March 14, 2017 decision.  (Tr. 10–

21, 36)  On November 8, 2017, the Appeals Council denied further review, rendering the ALJ's

decision the final decision of the Commissioner.  (Tr. 1–5)  On December 21, 2017, Smith

sought judicial review of the Commissioner's decision.  ECF Doc. 1.

## III.    Evidence

### A.    Personal, Educational and Vocational Evidence

Smith was born on February 14, 1966, and he was 48 years old on the alleged onset date.

(Tr. 40, 148)  Smith turned 50 on February 14, 2016.  Smith completed the ninth grade and never

got a GED.  (Tr. 40–41)  Smith had no past relevant work.  (Tr. 20, 52)

### B.    Relevant Medical Evidence—Physical Limitations

On March 24, 2014, Smith was admitted to Akron General Medical Center's ("AGMC")

emergency department due to blurry vision, facial droop, numbness in his face and hands, and

weakness in his left arm.  (Tr. 257, 267, 422)  Rohit Chandurkar, D.O., noted that Smith's face

drooped and became unexpressive earlier in the day, but that his facial symptoms resolved within

15 seconds.  (*Id.*)  Dr. Chandurkar noted that Smith had a history of high blood pressure, but had

stopped taking his medication seven years before his admission.  (*Id.*)  He also noted that Smith

smoked up to a pack of cigarettes per day.  (Tr. 258)  Smith was instructed on managing his high

blood pressure and smoking cessation to reduce his risk of stroke.  (Tr. 259)  Smith was

diagnosed with a transient ischemic attack ("TIA")[1] and chronic high blood pressure, and he was

---

[1] A TIA is a stroke-like attack that occurs when blood flow to part of the brain briefly stops.  *Transient Ischemic Attack*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/000730.htm (last visited Oct. 25, 2018).  Unlike a stroke, a TIA does not cause brain tissue to die, and the blockage breaks up quickly and dissolves.  *Id.*  Nonetheless, a TIA is a warning sign that a stroke may occur in the future.  *Id.*

given aspirin and potassium to treat his high blood pressure.  (Tr. 259, 261)  Jessica Whitley, M.D., noted that Smith would need outpatient treatment with blood pressure medications.  (Tr. 270)

On March 25, 2014, William Frieberg, D.O., noted that an enlarged thyroid was discovered during Smith's TIA treatment.  (Tr. 274–76)  The AGMC house surgeon determined that, because there was no airway compromise or other related symptoms, Smith did not have an immediate need for thyroid surgery.  (Tr. 273)  During a speech and language evaluation, the AGMC intake recovery team noted that Smith had normal auditory comprehension, verbal expression, non-verbal expression, cognitive skills, articulation, and voice.  (Tr. 402)  Medical records reflected that Smith's alertness, attention, problem solving, reasoning, and recall were all normal.  (*Id.*)

On March 27, 2014, Smith was discharged from AGMC.  (Tr. 297–300)  At discharge, Smith was diagnosed with posterior parietal infarction[2]/stroke, high blood pressure, high cholesterol, chronic smoking, an enlarged thyroid, a pituitary macroadenoma ("brain tumor"),[3] deep vein thrombosis,[4] and morbid obesity.  (Tr. 297; *see also* Tr. 327)  Dr. Whitley noted that

---

[2] A posterior parietal infarction is the death of tissue resulting from inadequate blood flow to the upper back part of the brain responsible for primary senses (smell, taste, temperature, and touch), reading, and arithmetic.  *See Infarction*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/infarction (last visited Oct. 25, 2018); *Brain Basics: Know Your Brain*, NAT'L INST. OF NEUROLOGICAL DISORDERS AND STROKE, https://www.ninds.nih.gov/ Disorders/Patient-Caregiver-Education/Know-Your-Brain#Image%201 (last visited Oct. 25, 2018) (discussing the parietal lobe).

[3] A pituitary macroadenoma is a one centimeter or larger tumor in a center part of the brain that is responsible for releasing hormones that control growth, metabolism, response to stress, and reproductive functions.  *Pituitary Tumors: Condition Information*, NAT'L INST. OF CHILD HEALTH AND HUM. DEV., https://www.nichd.nih.gov/health/ topics/pituitarytumors/conditioninfo/default (last visited Oct. 25, 2018).  An "adenoma" is a benign tumor, meaning that it is noncancerous and will not spread into other parts of the body; however, an adenoma may cause the pituitary gland to produce too much or too little hormones, which may result in health problems.  *Id.*  A cancerous tumor is called a "carcinoma," rather than an adenoma.  *Id.*

[4] Deep vein thrombosis occurs when a blood clot forms in a vein deep inside the body.  *Deep Vein Thrombosis*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/000156.htm (last visited Oct. 25, 2018).  If such a clot moves through the bloodstream, it may get stuck in the brain, lungs, heart, or other area and cause severe damage.  *Id.*  It can be treated through medications, including blood thinners.  *Id.*

Smith's symptoms had completely resolved, and that he felt completely normal.  (Tr. 298)

Dr. Whitley also noted that Smith's MRI revealed cerebral microvascular disease.  (*Id.*)

Nevertheless, Smith's brain scans were negative for a blood vessel blockage, narrowing, or

bulging.  (Tr. 330)

On April 20, 2014, Smith saw Nicholas Jouriles, M.D., because he was lightheaded and

had a headache after playing basketball.  (Tr. 248, 384)  Dr. Jouriles noted Smith's prior TIA,

and stated that he recovered from his stroke symptoms and managed his condition through

medication.  (*Id.*)  Smith denied any chest pain, shortness of breath, numbness, tingling,

weakness, paralysis, vision changes, headache, or vertigo.  (*Id.*)  On examination, Smith's blood

pressure, breathing, vision, and neurological condition were normal.  *(*Tr. 249, 385)

On July 13, 2014, Smith saw Daniel Chapa, M.D., for a sleep study.  (Tr. 228, 236, 364)

In a questionnaire, Smith indicated that he had no problems with his head/neck, nervous system,

heart, lungs, psychosocial functioning, or hormones.  (Tr. 236, 372)  Dr. Chapa diagnosed Smith

with obstructive sleep apnea and recommended that Smith lose weight and avoid driving or

operating heavy machinery when sleepy.  (Tr. 364)

On November 4, 2014, Smith saw his primary care physician, Dr. Andrea Jopperi, D.O.,

to discuss his stroke and inability to work.  (Tr. 520)  Smith told Dr. Jopperi that he needed to

prove he was disabled for social security benefits, and that a doctor told him that he would not be

able to work again after his stroke.  (*Id.*)  Smith reported that he felt weird sometimes, and that

he had frequent headaches.  (*Id.*)  On examination, Dr. Jopperi noted that Smith's eyes,

cardiovascular health, respiratory health, neurological health, and psychological health were all

normal.  (Tr. 521)

On December 2, 2014, Smith saw Dr. Jopperi.  (Tr. 509)  Dr. Jopperi noted that Smith complained of heartburn and feeling lightheaded when he went from sitting to standing. (Tr. 509)  On examination, Dr. Jopperi noted that Smith's cardiovascular, respiratory, and neurological health appeared normal.  (Tr. 510)  She continued Smith's treatment through medication.  (Tr. 510–12)

On December 23, 2014, Smith saw Dr. Omar Zmeili, M.D., at Summa Physicians for treatment of his enlarged thyroid and brain tumor.  (Tr. 478)  Smith reported that he had headaches and blurry vision related to his brain tumor, but denied having tunnel vision, nausea, muscle weakness, or any appetite problems.  (Tr. 479–80)  Dr. Zmeili noted that, notwithstanding Smith's enlarged thyroid, his neck appeared normal, without nodules, and not tender.  (Tr. 480)  Smith's cardiovascular and respiratory system were normal, no eye problems were noted, and no psychiatric problems were found.  (*Id.*)  Dr. Zmeili specifically noted that Smith was not depressed and had normal vision.  (Tr. 479–80)  On December 27, 2014, Dr. Zmeili determined that Smith had low thyroid stimulating hormones and testosterone, that his thyroid was enlarged with two nodules, and that he might refer Smith for thyroid removal. (Tr. 482)  Dr. Zmeili referred Smith to an ophthalmologist for a visual field examination. (Tr. 483)  Dr. Zmeili saw Smith again on February 27, 2015, with no changes to his impressions of Smith's condition.  (Tr. 554–56, 602–04)

On March 2, 2015, Dr. Jopperi noted that Smith was controlling his high cholesterol and blood pressure through medications, and that he denied any muscle or chest pain and shortness of breath.  (Tr. 495)  Smith denied having any headaches since he was prescribed tramadol a week prior, and Dr. Jopperi recommended decreasing his tramadol from once per day to as needed. (Tr. 495, 497)  She noted that Smith's high blood pressure was benign.  (Tr. 496)  On

examination, Dr. Jopperi indicated that Smith had normal cardiovascular, respiratory, and neurological health.  (*Id.*)

On March 20, 2015, Smith had an ophthalmology examination, which revealed that he had 20/25 corrected distance vision in both eyes and 20/25 uncorrected reading vision.[5]  (Tr. 534, 539)  The ophthalmologist noted that Smith's cooperation with the filed vision test was "fair," and the ophthalmologist suspected glaucoma caused Smith's vision issues.  (Tr. 535–36, 539)

On April 8, 2015, Smith had an MRI, which revealed that he had an enlarged pituitary.  (Tr. 545–46)  Shardul Vibhakar, M.D., noted that there was "no obvious encroachment of the optic nerves."  (*Id.*)  He also noted that Smith had small blood vessels, likely because of his stroke.  (Tr. 546)

On May 26, 2015, Dr. Zmeili noted that Smith was scheduled for brain tumor surgery, but that his enlarged thyroid could cause trouble with intubation.  (Tr. 549, 606)  He noted that Smith's brain tumor had become slightly larger, but that Smith had no visual changes from March 2015.  (*Id.*)  He indicated that Smith had "normal vision," stated that there was no obvious encroachment of the optic nerves or optic chiasm, and did not note any physical impairments or pain other than headaches.  (Tr. 550–51, 607–08)  Smith denied having tunnel vision or blurry

---

[5] Visual acuity is measured by comparing a person's sight with a normal person's vision.  *Visual Acuity Test*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/003396.htm (last visited Oct. 25, 2018).  For example, a result of 20/20 indicates that a person can see at 20 feet what a normal person could see at 20 feet, and a result of 20/40 indicates that a person can see at 20 feet what a normal person could see at 40 feet.  *Id.*  Visual acuity between 20/20 and 20/25 falls within the "normal" range, visual acuity between 20/32 and 20/63 falls within the "mild visual impairment" range, and visual acuity between 20/80 and 20/160 falls within the "moderate visual impairment" range.  *See* INT'L COUNCIL OF OPHTHALMOLOGY, VISUAL STANDARDS: ASPECTS AND RANGES OF VISION LOSS 7 (2002) (Table 3 – Ranges of Visual Acuity Loss in ICD-9, ICD-10, and ICD-9-CM), *available at* www.icoph.org/pdf/visualstandardsreport.pdf (last visited Oct. 25, 2018).  The listing of impairments directs that a person is blind if his visual acuity is 20/200 or worse in his better eye after best correction.  20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 2.02.

6

vision, and rated his headache pain as a 4/10.  (Tr. 551, 608)  Dr. Zmeili noted that Smith was conscious, had good judgment and concentration, and was not depressed.  (*Id.*)

On June 2, 2015, Smith saw Dr. Jopperi because he had leg pain that worsened after his stroke.  (Tr. 586)  Dr. Jopperi noted that Smith was compliant with his blood pressure medications, and that he was occasionally lightheaded when he stood from a sitting position.  (*Id.*)  Dr. Jopperi noted that Smith's pain could have been caused by his cholesterol medication, and lowered his dosage to see if it would help.  (Tr. 587)  She continued his blood pressure medication and prescribed a pain reliever to help with his headaches.  (*Id.*)  On June 16, 2015, Dr. Jopperi noted that smith "now has a lawyer and was told he should get a handicap placard." (Tr. 583)  Dr. Jopperi noted that Smith did not have any orthopedic issues, and that his leg pain was reduced with walking.  (*Id.*)  She determined that smith had "no indication for a handicap placard."  (Tr. 584)

On September 12, 2015, Dr. Jopperi noted that Smith's high blood pressure and cholesterol were controlled through medication and that he denied any muscle pain.  (Tr. 579)  Dr. Jopperi stated that Smith had a thyroidectomy scheduled for the week after his visit, and that he continued to have weakness due to his past stroke.  (*Id.*)  On examination, Dr. Jopperi indicated that Smith was oriented to time, place, and person; had a normal range of motion; and had a normal mood, affect, and behavior.  (Tr. 579–80)  Smith was negative for depression.  (Tr. 580)

On December 4, 2015, Dr. Zmeili noted that Smith cancelled his thyroidectomy.  (Tr. 595, 597)  On examination, Dr. Zmeili did not note any physical or visual impairments, and he stated that Smith was oriented and did not exhibit confusion, decreased concentration, nervousness, anxiety, or hyperactivity.  (Tr. 596–97)  Dr. Zmeili noted that Smith's brain tumor

was slightly larger, but did not encroach on his optic nerves or cause visual changes.  (Tr. 597–98)

On April 3, 2016, Smith had a thyroidectomy.  (Tr. 630, 650–51)  On April 6, 2016, Smith saw Christina Mager, D.O., for neck pain and trouble clearing his throat.  (Tr. 630)  Dr. Mager noted that Smith denied difficulty swallowing or breathing, and diagnosed Smith was postoperative pain.  (Tr. 630–31, 633–34)

On June 14, 2016, Smith told Dr. Jopperi that he complied with his thyroid medication and did not have any side effects.  (Tr. 662)  Dr. Jopperi noted that Smith's high blood pressure and cholesterol were also controlled through medication without side effects.  (*Id.*)  On examination, Dr. Jopperi indicated that Smith was oriented to time, place, and person; had a normal range of motion; was negative for visual problems; and had a normal mood, affect, and behavior.  (Tr. 662, 664)  Dr. Jopperi continued Smith's medications.  (Tr. 665)  Smith saw Dr. Jopperi again on July 25, 2016, and October 14, 2016, and Dr. Jopperi's assessment of his conditions did not change.  (Tr. 687–94, 699–703)

On October 10, 2016, Smith saw Dr. Zmeili, and Dr. Zmeili's overall assessment of Smith's condition did not change, except that he noted Smith had a thyroidectomy.  (Tr. 677–81)  Dr. Zmeili referred Smith to ophthalmology and neurosurgery for treatment of his brain tumor and related symptoms.  (Tr. 682)

On October 26, 2016, Smith saw Dr. Krishna Satyan, M.D., for a consultation.  (Tr. 704)  Dr. Satyan noted that Smith had no residual deficits after his stroke, and that he did not have any symptoms related to his brain tumor.  (*Id.*)  Upon examination, Dr. Satyan indicated that Smith was normal across all functional domains, including his eyes and psychiatric functions.  (Tr.

706–07)  Dr. Satyan instructed Smith on dietary management, and referred him for an MRI and follow-up appointments with neurology and ophthalmology.  (Tr. 707–08)

On December 14, 2016, Smith had a brain scan, which revealed no significant narrowing of blood vessels and no gross evidence that his brain tumor caused any vascular encasement. (Tr. 719–20)

On January 18, 2017, Smith saw neurologist Dr. Ahmed Itrat, M.D., who noted that Smith had a no recurrence of symptoms related to his stroke since he was placed on blood pressure medication in March 2014.  (Tr. 710)  On examination, Dr. Itrat did not note any physical abnormalities, and stated that Smith was alert, oriented, and followed commands. (Tr. 712–13)

### C.    Relevant Medical Evidence—Mental Limitations

On January 21, 2015, Smith saw Dr. Joshua Magleby, Ph.D., for a psychological examination.  (Tr. 463–70)  Smith told Dr. Magleby that he had a 5th grade education, that he was in special education classes for his behavior and learning problems, and that he quit school in 6th grade at the age of 16.  (Tr. 464)  Dr. Magleby noted that Smith had a history of a stroke, a brain tumor, chronic headaches, high blood pressure, pain in his left side, and sleep apnea.  (*Id.*) Smith told Dr. Magleby that his brain tumor caused vision problems, light sensitivity, and had a 50 percent chance to blind him if not removed.  (*Id.*)  He reported that he quit activities he used to do because he was terrified that he would have another stroke.  (*Id.*)  Dr. Magleby noted that Smith's "psychiatric history [was] vague," that Smith denied any formal diagnoses, and that Smith said his school told him he had attention deficit hyperactive disorder.  (*Id.*)  Smith reported that he received counseling after two suicide attempts in 1984 or 1985, but that he quit going. (*Id.*)  Smith said that he felt angry, disappointed, and irritable since his stroke, and that he felt

9

like he was getting worse.  (Tr. 464–65)  Smith reported that he left his previous job as a dishwasher because he got angry about his workload, and that he was fired from previous jobs for not doing what he was told to do, getting loud, or trying to fight.  (Tr. 465)  Dr. Magleby stated that, although Smith had never lived on his own, his daily routines were fairly normal and he was capable of independent daily living activities, including caring for his personal hygiene, organizing his living environment, communicating wants and needs, using public transit, and managing money.  (Tr. 465)  Dr. Magleby stated that Smith had a poor to fair ability to get along with others, resolve basic problems, use community resources, and coping.  (*Id.*)  Smiths' limitations due to psychiatric conditions were "mild to moderate."  (*Id.*)

On examination, Dr. Magleby noted that Smith made appropriate eye contact; was alert and oriented to time, place, person, and situation; had linear and fair-to-good flow of conversation and thought content; had a restricted, but congruent and good affect and mood; was not anxious; did not report any symptoms of trauma or stress disorder, except with regard to his stroke; did not report any perceptual disturbances, such as hallucinations or delusions; and had mostly fair judgment and insight.  (Tr. 466–67)  Dr. Magleby stated that Smith's mental processing seemed slowed, his fund of knowledge was poor, his intelligence was "estimated to be borderline," and he had a poor understanding of how his behavior affected other people. (Tr. 467)  Using the Wechsler Adult Intelligence Scale (4th Edition), Dr. Magleby determined that Smith had a full-scale IQ of 69, a verbal comprehension index of 58, a perceptual reasoning index of 77, and a processing speed index of 92.  (Tr. 467–68)  Dr. Magleby diagnosed Smith with a phobia of strokes, "unspecified neurocognitive disorder," chronic adjustment disorder with a depressed mood, and "unspecified personality disorder [antisocial and avoidant traits]." (Tr. 469)

### D.     Opinion Evidence

#### 1.     Treating Physician—Dr. Jopperi

On November 4, 2014, and March 2, 2015, Dr. Jopperi wrote letters stating that Smith had been her patient since August 2014.  (Tr. 191, 495)  She also stated that she had "extensively reviewed [Smith's] records from the time of his stroke in March 2014.  He has a pituitary macroadenoma that needs additional workup.  At this time, I would consider him disabled.  His ability to work in the future is undermined at this time."  (Tr. 191, 494)

On September 12, 2015, Dr. Jopperi completed a residual functional capacity ("RFC") evaluation.  (Tr. 577–78)  Dr. Jopperi opined that Smith's "residual weakness from stroke" caused a lifting/carrying impairment, and that Smith could lift up to 40 pounds at maximum, 20 pounds occasionally, and 10 pounds frequently.  (Tr. 577)  She stated that Smith could stand/walk for a total of 2 hours in an 8-hour day, and that he could stand/walk for 30 minutes without interruption.  (*Id.*)  Smith had no impairment with regard to sitting.  (*Id.*)  Dr. Jopperi stated that Smith could never climb, balance, stoop, or crouch, and that he could occasionally kneel and crawl.  (*Id.*)  She stated that Smith's weakness impaired his ability to tolerate heights, moving machinery, and vibrations, and that he would miss more than four days per month due to pain or fatigue.  (Tr. 577–78)  Dr. Jopperi indicated that Smith would be off task for 20 percent of the workday, that he would be able to use his hands 30 percent of the workday, and that he would need to take two unscheduled breaks per day.  (Tr. 578)

#### 2.     Consultative Examiner—Dr. Magleby

As part of his January 21, 2015, consultative examination, Dr. Magleby completed a "functional assessment."  (Tr. 469–70)  Dr. Magleby opined that Smith had a normal ability to understand, remember, and carry out simple instructions; that his concentration was good; and

that his ability to relate to others was appropriate.  (Tr. 469–70)  However, Smith had a

"somewhat impaired" ability to: (1) follow complex instructions or directions; (2) maintain

concentration, attention, persistence, and pace; (3) perform simple repetitive tasks; and

(4) withstand normal work stress.  (*Id.*)  Dr. Magleby stated that Smith's ability to perform multi-

step tasks appeared impaired.  (Tr. 470)

### 3.    Consultative Examiner—Dr. Osapay

On March 10, 2015, Smith saw Imola Osapay, M.D., for a consultative examination.  (Tr.

524)  Dr. Osapay reported that Smith was told that he had a brain tumor that needed surgery, and

that the surgery had a 50% chance to make him blind.  (Tr. 524)  Dr. Osapay noted that Smith's

brain tumor caused vision changes and headaches and that "pain medications sometimes ease the

pain."  (*Id.*)  Smith told Dr. Osapay that he was unable to shop or take care of his daily chores,

and that his girlfriend helped him take care of those needs.  (*Id.*)  Dr. Osapay noted that Smith's

uncorrected vision was 20/70 in each eye, and that his corrected vision in each eye was 20/30 for

a far test and 20/40 for a near test.  (Tr. 525)  Dr. Osapay stated that Smith could not drive a car,

had difficulty with steps, did not use a mobility assistive device, could sit for 30 minutes, could

stand for 10 minutes, could walk 100 feet, and could carry or lift no more than 40 pounds.  (*Id.*)

She stated that Smith could dress and bathe himself, but had difficulty cleaning and cooking.

(*Id.*)  On examination, Dr. Osapay noted that Smith's neck seemed enlarged, but there were no

nodules or lumps.  (*Id.*)  She noted that Smith had 5/5 strength in his upper and lower

extremities, full range of motion, normal sensation in his extremities, and a normal gait.  (Tr.

525–26)  Dr. Osapay opined that Smith's physical examination was unremarkable, and that

Smith had plans for management of the headaches, anxiety, and vision issues caused by his brain

tumor.  (Tr. 526)  She stated that she did not see Smith working in the near future, because the

management of his symptoms, including surgery, would preclude it. (*Id.*) Nevertheless, Dr. Osapay stated that Smith "might be considered for a position" after his treatment. (*Id.*)

### 4. State Agency Consultants

On February 11, 2015, state agency consultant David Demuth, M.D., evaluated Smith's mental abilities based on a review of the record. (Tr. 67–68, 71–73) Dr. Demuth noted that Smith's medically determinable mental impairments included organic mental disorder, affective disorder, anxiety disorder, and personality disorder. (Tr. 67) Dr. Demuth determined that Smith's mental impairments caused a "mild" restriction in activities of daily living; "moderate" difficulties in social functioning; "moderate" difficulties in concentration, persistence, and pace; and no repeated episodes of decompensation. (Tr. 67) Dr. Demuth determined that Smith was not significantly limited in his ability to remember locations, work-like procedures, and simple instructions, but he was moderately limited in his ability to understand and remember detailed instructions. (Tr. 71) He stated that Smith's tasks would "need to be routine and repetitive." (*Id.*) He indicated that Smith had sustained concentration and persistence problems; including moderate limitations in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted, compete a normal workday without interruptions from psychologically based symptoms, and perform at a constant pace without an unreasonable number and length of breaks. (Tr. 71–72) Dr. Demuth stated that Smith had social interaction limitations, including moderate limitations in his ability to interact appropriately with the general public, accept instructions, respond appropriately to supervisor criticism, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 72) He stated that Smith was moderately limited in his ability to respond appropriately to changes in the work setting, but that

he was not limited in his ability to tolerate normal workplace hazards, use public transportation, or set goals and make plans. (Tr. 72–73) Dr. Demuth stated that Smith would need a workplace with predictable changes. (Tr. 73) On July 28, 2015, Dr. Tonnie Hoyle, Psy.D., concurred with Dr. Demuth's opinion. (Tr. 84–85, 88–90)

On May 6, 2015, state agency consultant Leon Hughes, M.D., evaluated Smith's physical abilities based on a review of the record. (Tr. 69–71) Dr. Hughes stated that Smith could lift or carry up to 20 pounds occasionally and 10 pounds frequently, stand or walk for up to 6 hours, and sit for up to 6 hours in a normal workday. (Tr. 69) He stated that Smith could never climb ladders, ropes and scaffolds; occasionally climb ramps/stars; and frequently balance, stoop, kneel, crouch, and crawl. (Tr. 70) He indicated that Smith should avoid concentrated exposure to unprotected heights and hazards, such as machinery. (Tr. 70–71) On July 17, 2015, Dr. Esberdado Villanueva, M.D., concurred with Dr. Hughes' opinion. (Tr. 86–88)

### E.    Relevant Testimonial Evidence

Smith testified at the ALJ hearing. (Tr. 40–51) Smith testified that he went to school through the 9th grade, and that he never got a GED. (Tr. 41) He did not have a driver's license, and he lived with a friend. (*Id.*) Smith stated that he spent most of a typical day in bed, and that he did not do any cooking or cleaning. (Tr. 46) His friends took him to his doctors' appointments, or he rode the bus. (*Id.*) Smith testified that he last worked as a dish washer at a restaurant, but was fired because he "couldn't keep up." (Tr. 47)

Smith testified that he had a stroke in 2014 and had his thyroid removed in 2016. (Tr. 47) He stated that his thyroid and blood pressure medicine made him dizzy, and that his cholesterol medicine caused him to have pain in his legs. (Tr. 43) He had headaches caused by his stroke and a brain tumor. (Tr. 48) Smith said that his pain medication did not help his headaches

much, and that he had blurry vision all the time.  (Tr. 44)  He would lay down every day and

hope the pain would go away.  (Tr. 44)  Reading made his eyes hurt, he could not watch

television, and he could not use a computer.  (Tr. 44–45)  "Maybe twice" per week his headaches

made him throw up, and "eight [or] nine time s a month" he got light headed for "hours" due to

high blood pressure.  (Tr. 45)  He stated that he tossed and turned all night, and had to wear a

sleeping mask every day.  (Tr. 46)

Smith stated that his legs hurt if he stood too long (15 to 20 minutes), and that he would

have cramps if he walked too long.  (Tr. 48)  He "sometimes" had trouble sitting, and he could

sit for 15 to 20 minutes before he had to stand.  (Tr. 48–49)  He could walk half a block before

his legs hurt, and he felt short of breath "all the time."  (Tr. 49)  Smith stated that he could not

work because he was terrified of having another stroke and his condition had become worse.

(Tr. 49)  He said he had trouble concentrating, he could watch television for 20 minutes before

getting headaches, and he could not remember what happened at the beginning of a show when it

ended.  (Tr. 50–51)

Mark Anderson, a vocation expert ("VE"), also testified at the hearing.  (Tr. 51–56)  The

ALJ told the VE that Smith had no past relevant work.  (Tr. 52)  The ALJ asked the VE whether

a hypothetical individual, born in February 1966 with a limited education under the regulations,

no high school diploma, and no skills from past work that transferred could perform work, if that

individual:

> [could] lift, carry, push, and pull 20 pounds occasionally and ten pounds
> frequently. . . .  This person can sit for six hours, stand and/or walk for six hours
> in a normal work day.  This person cannot climb ladders, ropes, or scaffolds and
> can occasionally climb ramps and stairs.  This person can occasionally kneel and
> occasionally crawl.  This person must avoid workplace hazards such as
> unprotected heights or exposure to dangerous moving machinery.  This person is
> limited to tasks that can be learned in 30 days or less.  This person cannot direct
> the work of others and cannot be responsible for the safety or welfare of others.

15

> This person cannot perform piece rate work or assembly line work.  This person
> would be limited to occasional interaction with others.

(Tr. 52–53)  The VE testified that such an individual could perform light unskilled work,

including as an inspector and hand packager, electronics worker, and assembler of printed

products.  (Tr. 53)  The ALJ asked the VE to consider whether the above-described individual

could work if he also needed "frequent redirection from a supervisor in order to stay on task and

that this level of redirection would continue for the length of employment."  (Tr. 54)  The VE

testified that such an individual could not work, because a supervisor would not be available at

that rate.  (*Id.*)  The VE stated that such an individual would require a job coach, which would be

accommodated work.  (*Id.*)  The ALJ asked whether the individual described in the first

hypothetical could work if he also "would be off task 20% of the workday on an ongoing basis"

due to medical issues.  (*Id.*)  The VE stated that such an individual would not be able to work.

(*Id.*)  The ALJ asked whether the individual described in the first hypothetical could work if he

also "would miss work three days—at least three days each month on an ongoing basis" due to

medical issues.  (*Id.*)  The VE testified that such an individual would not be able to work.  (Tr.

54–55)  The VE noted that the *Dictionary of Occupational Titles* did not deal with time off task

or absences, but that he used other research to inform his testimony regarding those issues.  (*Id.*)

Smith's attorney asked the VE whether the individual described in the ALJ's first

hypothetical could work if he also could "only stand and walk for no more than two hours a

day."  (Tr. 55)  He testified that such an individual could perform light work, as a 2015 study

indicated that there were light jobs that could be performed sitting or standing.  (*Id.*)  The VE

stated that such jobs included electronics worker, assembler of printed products, and paint spray

inspector.  (Tr. 56)  Smith's attorney asked the VE whether the individual described in the ALJ's

first hypothetical could work if he also "would have blurry vision where [he] could only focus

16

. . . for no more than 30 minutes and then [his] vision would become blurry and [he would] have headaches . . . [and] it would take at least 30 minutes to clear." (*Id.*)  The VE stated that such an individual could not work.  (*Id.*)  At the end of the hearing, Smith's counsel noted that Smith "change[d] age categories last February."  (Tr. 57)

## IV.    The ALJ's Decision

The March 14, 2017 ALJ decision found that Smith was not disabled and denied his application for supplemental security income.  (Tr. 10–21)  The ALJ determined that Smith had not engaged in substantial gainful activity since April 11, 2014, the application date.  (Tr. 12)  The ALJ found that Smith had "the following severe impairments: headaches, status post transient ischemic attack, pituitary macroadenoma, neurocognitive disorder, adjustment disorder, and personality disorder."  (*Id.*)  The ALJ determined that Smith's "visual difficulties [did] not cause more than minimal limitation to [Smith's] ability to perform basic work related activities, as shown in multiple examination findings."  (*Id.*)  The ALJ determined that Smith had no impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.  (*Id.*)  The ALJ also determined that Smith lacked any past relevant work.  (Tr. 20)

The ALJ determined that Smith had the RFC to perform light work, except that:

[H]e cannot climb ladders, ropes, or scaffolds.  He can occasionally climb ramps and stairs.  He can occasionally knee and crawl.  He should avoid workplace hazards such as unprotected heights or dangerous moving machinery.  He is limited to tasks that can be learned in thirty days or less.  He is limited to work that does not involve directing the work of others or being responsible for the safety or welfare of others.  The claimant cannot perform piece rate work or assembly line work.  The claimant is limited to only occasional interaction with others.

(Tr. 14)

17

In assessing Smith's RFC, the ALJ explicitly stated that he "considered all symptoms" in light of the medical and other evidence in the record.  (*Id.*)  The ALJ stated that Smith's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the ALJ found that Smith's complaints regarding the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 15, 19)  The ALJ stated that the record did not indicate that Smith's mental impairments were as severe as she alleged, because there was no evidence of any mental health counseling or treatment, mental status findings by medical treating sources were consistently unremarkable, and his one-time mental examination was inconsistent with ongoing treatment notes.  (Tr. 19)  Nevertheless, the ALJ stated that he considered Smith's mental limitations to the extent that they were supported by the consultative examination findings and unremarkable findings elsewhere in the record.  (*Id.*)  The ALJ also stated that, although Smith complained of pain, weakness, dizziness, vision disruption, and headaches, his physical examination findings were generally unremarkable, his treatment following his TIA was limited, and treatment notes did not indicate any notable changes or the need for additional treatment.  (*Id.*)  The ALJ noted that Smith's claim that he faced a 50 percent chance of blindness was not documented in any medical record.  (*Id.*)

ALJ gave Dr. Jopperi's opinions little weight.  (Tr. 17)  He explained that Dr. Jopperi's letters were conclusory and "not consistent with the unremarkable physical examination findings throughout the record, the course of care, or [Dr. Jopperi's] statement regarding a handicapped placard."  (Tr. 17)  The ALJ also stated that Dr. Jopperi's September 2015 RFC assessment was inconsistent with: (1) physical examination findings showing that Smith had full strength, no

decreased range of motion, no pain to palpation; (2) insignificant findings regarding headaches; and (3) reports that doctors controlled Smith's symptoms with medication.  (Tr. 17–18)

The ALJ also gave Dr. Magleby's opinion little weight, because he found it was vague and unsupported by the record.  (Tr. 18)  The ALJ stated that the record lacked evidence of mental health treatment, or corroborating evidence of the cognitive deficits Dr. Magleby had noted.  (*Id.*)

The ALJ gave Dr. Osapay's opinion little weight because it "appeared to rely on [Smith's] subjective complaints, which were not corroborated in the record."  (Tr. 19)  The ALJ stated that Dr. Osapay's opinion was also conclusory and did not address the unremarkable findings in the record, but "relied upon supposition regarding [Smith's] ability to recover from surgery (which he did not undergo during the relevant period in the case of the pituitary tumor)" (*Id.*)

The ALJ gave Dr. Demuth's, Dr. Hoyle's, Dr. Hughes', and Dr. Villanueva's opinions great weight.  (Tr. 18–19)  The ALJ explained that their opinions were consistent with the objective medical evidence in the record, the lack of ongoing mental health treatment, the single mental status examination showing findings and complaints that were otherwise undocumented, the conservative treatment of Smith's physical symptoms, the generally unremarkable physical examination findings, the lack of follow-up treatment for Smith's TIA, and the limited symptoms or treatment related to Smith's brain tumor.  (*Id.*)

The ALJ stated that Smith was a "younger individual" when he filed his application, and that he had at least a high school education.[6]  (Tr. 20)  The ALJ stated that, if Smith were able to

---

[6] The ALJ's finding concerning Smith's education was error.  As noted at page 2 *supra*, Smith never obtained a GED.  Any error on this point is harmless or waived because Smith has not argued the point and because no different outcome would have resulted had the finding been correct.  *See infra* at p. 33, *et seq.*

perform the full range of light work, the Medical-Vocational Guidelines would direct a finding of "not disabled." (*Id.*) Because the ALJ found Smith was unable to perform all or substantially all of the requirements of light work, he relied on the VE's testimony to determine whether Smith could perform a significant number of other jobs. (*Id.*) Based on the VE's testimony and considering Smith's RFC, age, education, and experience, the ALJ found that Smith was "capable of making a successful adjustment to other work that exists in significant numbers." (Tr. 20–21) In light of his findings, the ALJ determined that Smith was not disabled from April 11, 2014, through the date of his decision and denied Smith's application for supplemental security income. (Tr. 21)

## V.       Law & Analysis

### A.       Standard of Review

The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. §§ 405(g) and 1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rodgers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (providing that, if the Commissioner's findings as to any fact are supported by substantial evidence, those findings are conclusive); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when

testifying.").  Even if the court does not agree with the Commissioner's decision, or substantial evidence could support a different result, the court must affirm if the Commissioner's findings are reasonably drawn from the record and supported by substantial evidence.  *See Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record.")  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Though the court's review is deferential, the court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).  ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009).  ("Generally, however, we review decisions of administrative agencies for harmless error.  Accordingly . . . we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses" (citations and quotation omitted)).  However, the court will not uphold a decision, even when supported by substantial evidence, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78

F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS

157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot

determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-CV-734,

2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,*

No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*,

No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an

accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

Social Security regulations outline a five-step sequential evaluation the ALJ must use to

determine whether a claimant is entitled to supplemental security income or disability benefits:

(1) whether the claimant has engaged in substantial gainful activity; (2) if not, whether the

claimant has a severe impairment or combination of impairments; (3) if so, whether that

impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R.

§ 404, Subpart P; (4) if not, whether the claimant can perform her past relevant work in light of

her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience,

she can perform other work found in the national economy.  20 C.F.R. §§ 404.1520(a)(4)(i)–(v)

and 416.920(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006)  The

claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled

and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a) and 416.912(a).

### B. Medical Opinion Evidence

Smith argues that the ALJ erred by giving little weight to the opinions of Dr. Jopperi,

Dr. Osapay, and Dr. Magleby, and by giving great weight to the state agency consultants'

opinions.  ECF Doc. 12, Page ID# 787–92.  He asserts that, as a treating physician, Dr. Jopperi's

opinion should have been given controlling weight because her clinical findings supported it and

because it was consistent with other medical evidence.  *Id.* at 787–88, 791.  He contends that the ALJ should not have discounted Dr. Magleby's opinion because it was supported by his psychological examination.  *Id.* at 788.  In contrast, Smith asserts that the ALJ should not have given great weight to the state agency consultants' opinions, because they "did not have the opportunity to review the relevant metical evidence" and the evidence in the record did not support their opinions.  *Id.* at 792.  Finally, Smith argues that the ALJ "played doctor" by rejecting Dr. Jopperi's, Dr. Osapay's, and Dr. Magleby's opinions.  *Id.* at 791, 794.

The Commissioner responds that the ALJ applied proper legal procedures and reached a decision supported by substantial evidence in weighing the medical opinion evidence.  ECF Doc. 15, Page ID# 858–67.  The Commissioner argues that the ALJ provided good reasons for rejecting Dr. Jopperi's opinions when he explained that her opinions were conclusory and inconsistent with other medical evidence.  *Id.* at 858–62.  The Commissioner contends that the ALJ properly gave non-treating physician Dr. Osapay's opinion little weight, because his opinion relied only upon Smith's subjective complaints rather than his own clinical findings that Smith's condition was "unremarkable" and "normal."  *Id.* at 862–63.  Moreover, the Commissioner notes that Dr. Osapay did not analyze Smith's function limitations, but merely opined on the ultimate disability question reserved for the Commissioner.  *Id.* at 862.  The Commissioner also argues that the ALJ properly gave Dr. Magleby's opinion little weight, because the limitations he described were inconsistent with Smith's lack of mental health treatment and with clinical findings that his neurological function was "normal" and he had no cognitive deficits.  *Id.* at 866.  Furthermore, the Commissioner also notes that, despite giving little weight to Dr. Jopperi's and Dr. Magleby's opinions, the ALJ's RFC assessment was ultimately consistent with the supported functional limitations that Dr. Jopperi and Dr. Magleby described.  *Id.* at 860, 866–67.  Finally,

23

the Commissioner asserts that the ALJ properly gave Dr. Hughes', Dr. Villanueva's,

Dr. Demuth's, and Dr. Hoyle's opinions great weight because they were consistent with

objective medical evidence in the record, including the evidence submitted after those opinions

were issued.  *Id.* 863–65, 867.

Smith replies that the ALJ failed to sufficiently explain why he rejected Dr. Jopperi's

opinion, because he did not identify specific discrepancies with the other medical evidence.  ECF

Doc. 16, Page ID# 875.  Further, Smith reiterates his argument that the ALJ erred by relying on

the state agency consultants' and his own opinion in rejecting Dr. Jopperi's opinion.  *Id.* at 875–

77.  Finally, Smith argues that this court should not rely on the Commissioner's *post-hoc*

rationalization that the RFC contained limitations consistent with Dr. Jopperi's assessments.  *Id.*

at 876.

At Step Four, an ALJ must weigh every medical opinion that the Social Security

Administration receives.  20 C.F.R. § 416.927(c).  An ALJ must give a treating physician's

opinion controlling weight, unless the ALJ articulates good reasons for discrediting that opinion.

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  "Treating-source opinions

must be given 'controlling weight' if two conditions are met: (1) the opinion is 'well-supported

by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is

not inconsistent with the other substantial evidence in [the] case record.'"  *Id.*  (Quoting 20

C.F.R. § 404.1527(c)(2)).  Good reasons for rejecting a treating physician's opinion may include

that: "(1) [the] treating physician's opinion was not bolstered by the evidence; (2) evidence

supported a contrary finding; or (3) [the] treating physician's opinion was conclusory or

inconsistent with the doctor's own medical records."  *See Winschel v. Comm'r of Soc. Sec.*, 631

F.3d 1176, 1179 (11th Cir. 2011) (quotation omitted); 20 C.F.R. § 416.927(c).  Inconsistency

with nontreating or nonexamining physicians' opinions alone is not a good reason for rejecting a treating physician's opinion.  *See Gayheart*, 710 F.3d at 377 (stating that the treating physician rule would have no practical force if nontreating or nonexamining physicians' opinions were sufficient to reject a treating physician's opinion).

If an ALJ does not give a treating physician's opinion controlling weight, he must determine the weight it is due by considering the length of the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist.  *See Gayheart*, 710 F.3d at 376; 20 C.F.R. § 416.927(c)(2)–(6).  Nothing in the regulations requires the ALJ to explain how he considered each of the factors.  *See* 20 C.F.R. § 416.927(c).  Nevertheless, the ALJ must provide an explanation "sufficiently specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating source's medical opinion and the reasons for that weight."  *Gayheart*, 710 F.3d at 376; *see also Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight he actually assigned.").  When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for rejecting a treating physician's opinion, remand is appropriate.  *Cole*, 661 F.3d at 939.

 "[O]pinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'"  *Gayheart*, 710 F.3d at 376.  Instead, an ALJ must weigh such opinions based on: (1) the examining relationship; (2) the degree to which supporting explanations consider pertinent evidence; (3) the opinion's consistency with the record as a whole; (4) the physician's specialization related to the medical issues discussed; and (5) any other factors that

tend to support or contradict the medical opinion. *Id.*; 20 C.F.R. § 416.927(c). Generally, an examining physician's opinion is due more weight than a nonexamining physician's opinion. 20 C.F.R. § 416.927(c)(2); *Gayheart*, 710 F.3d at 375. An ALJ does not need to articulate good reasons for rejecting a nontreating or nonexamining opinion. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (declining to address whether an ALJ erred in failing to give good reasons for not accepting non-treating physicians' opinions). An ALJ may rely on a state agency consultant's opinion, and may give such opinions greater weight than other nontreating physicians' opinions if they are supported by the evidence. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 274 (6th Cir. 2015). Further, an ALJ may rely on a state agency consultant's opinion that predates other medical evidence in the record, if the ALJ takes into account any evidence that the consultant did not consider. *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009).

Notwithstanding the requirement that an ALJ consider and weigh medical opinion evidence, the ALJ is not required to give any deference to opinions on issues reserved to the Commissioner. 20 C.F.R. § 416.927(d) These issues include: (1) whether a claimant has an impairment or combination of impairments that meets or medically equal an impairment in the Listing of Impairments; (2) the claimant's RFC; (3) the application of vocational factors; and (4) whether a claimant is "disabled" or "unable to work." 20 C.F.R. § 416.927(d)(1)–(2).

Here, the ALJ applied proper legal procedures in weighing the medical opinion evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.2d at 125; *Kinsella*, 708 F.2d at 1059. The ALJ complied with the regulations by specifically stating that Dr. Jopperi's opinion was not entitled to controlling weight, and that Dr. Jopperi's, Dr. Magleby's, and Dr. Osapay's opinions merited little weight. 20 C.F.R. § 416.927; *Gayheart*, 710 F.3d at 376; (Tr. 17–19) The ALJ was not

26

required to defer to any of the physicians' opinions on the ultimate question of whether Smith was disabled.  20 C.F.R. § 416.927(d).  The ALJ gave good reasons for giving little weight to Dr. Jopperi's opinion by stating that her opinion was inconsistent with the unremarkable physical examination findings in the record, including her findings that Smith had full strength and range of motion, Dr. Jopperi's own rejection of Smith's request for a handicapped auto placard, and Dr. Jopperi's conservative treatment through medication.  20 C.F.R. § 416.927(c); *Gayheart*, 710 F.3d at 376–77; *Cole*, 661 F.3d at 938; *Winschel*, 631 F.3d at 1179; (Tr. 17–18).

Because they were not treating sources, the ALJ was not required to give controlling weight to, or explain his reasons for giving little weight to, Dr. Magleby's and Dr. Osapay's opinions.  20 C.F.R. § 416.927(c); *Gayheart*, 710 F.3d at 376; *Smith*, 482 F.3d at 876. Nevertheless, the ALJ adequately explained that Dr. Magleby's opinion was inconsistent with and not corroborated by other evidence in the record, and that Dr. Osapay's opinion was based on Smith's own subjective complaints and not corroborated by other evidence in the record.  (Tr. 18–19)  Finally, the ALJ was permitted to rely on Dr. Demuth's, Dr. Hoyle's, Dr. Hughes', and Dr. Villanueva's opinions and give them greater weight than the other non-treating physicians' opinions, as he considered the evidence that was not before the state agency consultants and found that their opinions were consistent with other evidence in the record.  *Reeves*, 618 F. App'x at 274; *McGrew*, 343 F. App'x at 32; (Tr. 18–19).

Substantial evidence also supported the ALJ's weighing of the medical opinion evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.2d at 125; *Kinsella*, 708 F.2d at 1059. Evidence in the record supported the ALJ's reasons for rejecting Dr. Jopperi's opinion, including: (1) Dr. Jopperi's and Dr. Zmeili's treatment notes indicating unremarkable physical examination findings; (2) Dr. Jopperi's finding that Smith had full range of motion;

(3) Dr. Osapay's findings that Smith had full strength and range of motion; (4) Dr. Jopperi's conservative treatment through medication and conclusion that Smith did not qualify for a handicapped placard because he had no osteopathic issues and reduced his leg pain by walking; (5) Dr. Satyan's and Dr. Itrat's statements that Smith had no residual symptoms from his stroke, functioned normally across all domains, and could manage his symptoms through medication and diet; and (6) Smith's own statements, in a treatment questionnaire after his TIA, that he did not have any physical problems.  (Tr. 236, 372, 479–80, 496, 510, 521, 525–26, 550–51, 554–56, 579–80, 583–84, 586–87, 596–97, 602–04, 607–08, 662, 664–65, 677–81, 687–94, 699–704, 706–07, 710, 712–13)  Further, Dr. Magleby's opinion was inconsistent with the lack of evidence showing that Smith received regular mental health treatment; findings throughout the record that Smith had normal cognition, comprehension, alertness, attention, problem solving, reasoning, recall, concentration, and orientation; and findings that he had no residual symptoms from his stroke.  (Tr. 248, 384, 402, 480, 521, 551, 554–56, 579–80, 596–97, 602–04, 608, 662, 664, 687–94, 699–704, 710)  Evidence also supported the ALJ's reasons for rejecting Dr. Osapay's opinion, as (1) Dr. Osapay relied primarily on Smiths' own subjective complaints that were not corroborated in the medical evidence; (2) her opinion was inconsistent with her own unremarkable physical examination findings and findings that Smith had plans to manage his headaches, anxiety, and vision issues; and (3) she did not reconcile her opinion with conflicting evidence showing unremarkable physical, visual, and psychological findings.  (Tr. 236, 248, 372, 384, 402, 479–80, 496, 510, 521, 524–26, 534–36, 545–46, 550–51, 554–56, 579–80, 583–84, 586–87, 596–97, 602–04, 607–08, 662, 664–65, 677–81, 687–94, 699–704, 706–07)  Finally, evidence supports the weight given to the state agency consultants' opinions that Smith could perform a range of light work and had no more than moderate limitations, as

28

they were consistent with the generally unremarkable physical and psychological findings in the record. (*Id.*) Thus, even if evidence in the record could support a different result, the ALJ's weight determinations fall within the Commissioner's "zone of choice" because they were reasonably drawn from the record. *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241; *Mullen*, 800 F.3d at 545.

### C.  Subjective Symptom Complaints

Smith argues that the ALJ improperly rejected his subjective symptom complaints. ECF Doc. 12, Page ID# 792–94. He asserts that, because Dr. Jopperi's clinical findings and opinions supported his subjective symptom complaints, the ALJ "erred when he did not find Smith's testimony credible and supported by the objective medical evidence and the observations of his treating physician." *Id.* at 794.

The Commissioner responds that the ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in finding that Smith's subjective symptom complaints were inconsistent with the other objective evidence in the record. ECF Doc. 15, page ID# 868–70. Further, the Commissioner notes that the ALJ did not reject all of Smith's subjective symptom complaints regarding his mental impairments, but considered and accounted for the mental limitations that were supported by evidence by including significant mental limitations in Smith's RFC. *Id.* at 869.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). Nevertheless, an ALJ is not required to accept a claimant's subjective symptom complaints, and may properly discount the claimant's testimony about his symptoms when it is inconsistent with objective medical and other evidence. *See*

*Jones*, 336 F.3d at 475–76; SSR 16-3p, 82 Fed. Reg. 49462, 49465 (Oct. 25, 2017).  ("We will consider and individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.")  In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the claimant's efforts to alleviate his symptoms, and the type and efficacy of any treatment.  SSR 16-3p, 82 Fed. Reg. at 49465–66; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

Here, the ALJ applied proper legal standards and reached a conclusion supported by substantial evidence when he determined that Smith's statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record.  42 U.S.C. §§ 405(g), 1383(c)(3), *Elam*, 348 F.3d at 125; *Kinsella*, 708 F.2d at 1059.  First, the ALJ applied the correct legal standard by assessing Smith's subjective symptom complaints based on their consistency with the medical and other evidence, articulating that Smith's complaints were not entirely consistent with the other evidence in the record, and crediting Smiths' complaints to the extent they were consistent with the medical and other evidence.  *Jones*, 336 F.3d at 475–76; *Temples*, F. App'x at 462; SSR 16-3p, 82 Fed. Reg. at 49465–66; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); (Tr. 14–15, 19).  Further, substantial evidence supported the ALJ's determination that Smith's subjective symptom complaints were not entirely consistent with the other evidence in the record, which revealed that: (1) Dr. Zmeili's and Dr. Jopperi's physical and mental status examination findings

30

were consistently unremarkable; (2) his treating physicians regularly determined that his attention, orientation, concentration, and ability to follow commands were not impaired; (3) his treatments were generally conservative: physicians managed his symptoms through medication; and (4) he quickly recovered from his TIA and had no residual stroke symptoms by October 2016.  (Tr. 236, 248, 372, 384, 402, 479–80, 496, 510, 521, 524–26, 534–36, 545–46, 550–51, 554–56, 579–80, 583–84, 586–87, 596–97, 602–04, 607–08, 662, 664–65, 677–81, 687–94, 699–704, 706–07)  Furthermore, Smith's visual acuity tests, measuring his vision between 20/25 and 20/70, indicated that he had only mild to moderate loss of vision.  (Tr. 525, 534–36, 539); *see also* INT'L COUNCIL OF OPHTHALMOLOGY, VISUAL STANDARDS: ASPECTS AND RANGES OF VISION LOSS 7 (2002) (indicating that a visual acuity of 20/25 is within the normal range, and that visual acuity between 20/30 and 20/70 falls within the mild to moderate ranges), *available at* www.icoph.org/pdf/visualstandardsreport.pdf (last visited Oct. 25, 2018).  Thus, the ALJ properly determined that the objective medical evidence did not confirm Smith's description of his symptoms, and this court may not disturb the ALJ's finding that Smith's subjective symptom complaints were not entirely consistent with the objective medical and other evidence in the record.  42 U.S.C. §§ 405(g), 1383(c)(3); *Jones*, 336 F.3d at 476; *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241; *Blankenship*, 874 F.2d at 1123.

## D.    Disability Finding

Smith argues that the ALJ improperly "disregarded objective or subjective evidence which would have resulted in a finding of disabled" at Step Five.  ECF Doc. 12, Page ID# 794–95.  Specifically, Smith asserts that the ALJ failed to account for "the cumulative effects of Smith's [vision and concentration] impairments and include them in the RFC," when he did not find Smith disabled based on the VE's testimony that the effect of being able to focus only in 30

minute increments  and need for frequent redirection would preclude work.  *Id.* at 795–96.

Smith contends that "[e]ven if the ALJ was correct in finding that Smith was able to perform

work that existed in the national economy, he erred when he did not limit him to no more than

the sedentary level of exertion."  *Id.* at 796.  Finally, Smith argues that the court should "consider

remanding for an award of benefits as of his fiftieth birthday," noting that the ALJ found that

Smith was a "younger individual" even though he was 50 years old at the time of the decision.

*Id.*

The Commissioner responds that the ALJ properly found that Smith was not disabled at

Step Five.  ECF Doc. 15, Page ID# 870–71.  The Commissioner argues that the ALJ was not

required to include Smith's purported inability to focus for more than 30 minutes due to blurry

vision in his hypothetical to the VE, because the ALJ had rejected that limitation.  *Id.*

Furthermore, the Commissioner asserts that the ALJ's failure to consider that Smith had a

limited education and was a "person closely approaching advanced age" for part of the relevant

period was harmless.  *Id.* at 871 & n.6.  Specifically, the Commissioner contends that the

medical-vocation guidelines direct the same "not disabled" finding for a person capable of

performing light work whether he is younger or closely approaching advanced age, and whether

he has a high school or limited education.  *Id.*  Moreover, the Commissioner argues that the

ALJ's hypothetical question to the VE accounted for Smith's limited education.  *Id.*  Finally, the

Commissioner asserts that Smith's argument that the ALJ erred in not limiting him to sedentary

work is unavailing, because he proffered no evidence to support such a limitation.  *Id.*

Smith's reply brief argues that "the ALJ failed to follow the regulations when he

disregarded any evidence that would have limited Smith to a sedentary level of exertion and/or

found that he was [able] to perform to perform any work in the national economy." ECF
Doc. 16, Page ID# 877.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by
considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). The
RFC is an assessment of a claimant's ability to do work despite his impairments. *Walton v.
Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and
SSR 96-8p, 61 Fed. Reg. 34474, 34475 (July 4, 1996)). "In assessing RFC, the [ALJ] must
consider limitations and restrictions imposed by *all* of an individual's impairments, even those
that are not 'severe.'" SSR 96-8p, 61 Fed. Reg. at 34477. Relevant evidence includes a
claimant's medical history, medical signs, laboratory findings, and statements about how the
symptoms affect the claimant. 20 C.F.R. § 416.929(a). A person with an RFC to perform light
work can lift no more than 20 pounds at a time, can frequently lift up to 10 pounds, and may
perform work that involves "a good deal of walking or standing, or . . . sitting with some pushing
and pulling of arm or leg controls." 20 C.F.R. § 416.967(b).

At the final step of the sequential analysis, the burden shifts to the Commissioner to
produce evidence supporting the contention that the claimant can perform a significant number
of jobs in the national economy. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir.
2002); 20 C.F.R. § 416.920(a)(4)(v). An ALJ may determine whether the claimant has the
ability to perform work in the national economy by applying the medical-vocational guidelines.
20 C.F.R. § 416.969; 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00. The medical-vocational
guidelines provide a series of matrices that correlate a set of variables—the claimant's RFC, age,
educational background, and previous work experience. *See generally* 20 C.F.R. Pt. 404, Subpt.
P, App. 2. When these variables are entered into the appropriate matrix, a finding of disabled or

not disabled is directed.  *Id.*  Nevertheless, the medical-vocational guidelines "do not cover all possible variations of factors."  20 C.F.R. § 416.969.  When a claimant's particular characteristics do not coincide with a rule's corresponding criteria, such as when a claimant is unable to perform the full range of a category of work, the medical-vocational guidelines do not direct a conclusion of disabled or not disabled.  20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a), (d).

Age and education are vocational characteristics that affect a claimant's ability to work. 20 C.F.R. §§ 416.963(a), 416.964.  A person under age 50 is classified as "younger," and a person aged 50 to 504 is classified as "closely approaching advanced age," and a person aged 55 or older is classified as "advanced age."  20 C.F.R. § 416.963(c)–(d).  A person with a 7th through 11th grade education is classified as having "limited education."  20 C.F.R. § 416.694(b)(3).  Such a person generally cannot perform "most of the more complex job duties needed in semi-skilled or skilled jobs," unless he has transferrable skills from past semi-skilled or skilled work.  20 C.F.R. §§ 416.964(b)(3), 416.965(a).  A person with a 12th grade education or above is classified as having "high school education and above," and is generally considered to be able to do semi-skilled through skilled work.  20 C.F.R. § 416.964(b)(4).  The medical-vocational guidelines direct a finding of "not disabled" when a claimant is capable of performing the full range of light work and has limited or greater education, regardless of whether he is "closely approaching advanced age" or "younger."  20 C.F.R. Pt. 404, Subpt. P, App. 2 §§ 202.10–202.22.

Alternatively, an ALJ may determine that a clamant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs.  *Howard*, 276 F.3d at 238.  A vocational expert's testimony in

response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC.  *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations").  "An ALJ is only required to incorporate into a hypothetical question those limitations he finds credible."  *Lee*, 529 F. App'x at 715; *see also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.")

An ALJ's error is harmless if, absent the error, he would have applied the same procedure and reached the same conclusion.  *See Berryhill v. Shalala*, No. 92-5876, 1993 WL 361792 *7 (6th Cir. Sept. 16, 1993) (unpublished) (reviewing whether the Appeals Council's erroneous rationale for finding that a rent reduction was unearned income for harmless error); *Kobetic v. Comm'r*, 114 F. App'x 171, 173–74 (6th Cir. 2004) (holding that an ALJ's erroneous conclusion that *res judicata* precluded consideration of an 8-day time period was harmless, because the ALJ considered evidence that could have applied to that period); *cf. Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012) (holding that, even if an ALJ's adverse credibility determination is based partially on invalid reasons, the error is harmless so long as substantial evidence supports the ALJ's conclusion).  An ALJ's error is not harmless when the ALJ's failure to follow the regulations prejudices the claimant on the merits or deprives him of a substantial right.  *See Bowen,* 478 F.3d at 746.  ("Even if supported by substantial evidence, however, a

decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Smith's challenge of the ALJ's RFC determination is unavailing. The ALJ applied proper legal procedures and reached a decision supported by substantial evidence in determining that Smith had the RFC to perform a range of light work, notwithstanding, and unlimited by, his alleged vision and concentration impairments. 42 U.S.C. §§ 405(g), 1383(c)(3), *Elam*, 348 F.3d at 125; *Kinsella*, 708 F.2d at 1059. Here, the ALJ followed proper legal procedures by considering all of Smith's impairments, severe or otherwise, in light of the medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 416.920(e), 416.929(a); SSR 96-8p, 61 Fed. Reg. at 34477; (Tr. 14–20). Evidence in the record supported the ALJ's determination that Smith could perform a range of light work, because the objective medical evidence indicated that he could lift up to 20 pounds, lift10 pounds frequently, stand and walk for up to 6 hours, sit for up to 6 hours, occasionally climb ramps/stairs, and frequently balance, stoop, kneel, crouch, and crawl. 20 C.F.R. § 416.967(b); (Tr. 69–71, 86–88, 525–26, 579–80, 662, 664, 712–13). Further, substantial evidence supported the ALJ's decision not to include Smith's claimed vision and concentration impairments in the RFC, because, as discussed above, his subjective complaints regarding those symptoms were inconsistent with medical and other evidence in the record. (Tr. 67, 71–73, 84–85, 88–90, 469–70, 479–80, 525, 534–36, 539, 550–51, 554–56, 577, 596–98, 602–04, 607–08, 662, 664,706–07, 712–13) Thus, this court should not disturb the ALJ's conclusion that Smith could perform a range of light work, notwithstanding, and unlimited by, his alleged vision and concentration impairments. 42 U.S.C. §§ 405(g), 1383(c)(3); *Jones*, 336 F.3d at 476; *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241; *Walton*, 773 F. Supp. 2d at 747.

The ALJ also applied proper legal procedures and reached a conclusion supported by substantial evidence in determining that Smith was not disabled at Step Five. 42 U.S.C. §§ 405(g), 1383(c)(3), *Elam*, 348 F.3d at 125; *Kinsella*, 708 F.2d at 1059. The ALJ erred by failing to find that Smith was "closely approaching advanced age" for part of the relevant period and had only a "limited education," given that Smith turned 50 in February 2016 and had completed only the ninth grade. 20 C.F.R. §§ 416.963(c)–(d); 416.964(b)(3), 416.965(a); (Tr. 20, 40–41, 148). Because the medical-vocational guidelines do not direct a "disabled" finding when a clamant can perform light work and has limited or greater education, regardless of whether he is "closely approaching advanced age" or "younger," and Smith was not capable of performing the full range of light work, the ALJ had to rely on VE testimony to determine whether Smith was disabled. 20 C.F.R. § 416.969; 20 C.F.R. Pt. 404, Subpt. P, App. 2 §§ 200.00(a), (d), 202.10–202.22; *Howard*, 276 F.3d at 238; (Tr. 20–21). Because the ALJ's hypothetical to the VE directed the VE to consider that Smith had a limited education and to consider Smith's actual age, rather than directing the VE to consider that Smith was "younger," the ALJ's failure to find that Smith was "closely approaching advanced age" and had a "limited education" when applying the medical-vocational guidelines was harmless error. *Bowen*, 478 F.3d at 746; *Berryhill*, No. 92-5876, 1993 WL 361792 at *7; *Kobetic*, 114 F. App'x at 173–74; (Tr. 52–53). Further, the VE's testimony that Smith could work as an inspector and hand packager, electronics worker, and assembler of printed products was substantial evidence supporting the ALJ's conclusion that Smith could perform a significant number of jobs, because the ALJ's hypothetical question reflected Smith's actual characteristics and RFC, excluding the alleged functional limitations that the ALJ did not find credible. *Howard*, 276 F.3d at 238; *Lee*, 529 F. App'x at 715; *Blacha*, 927 F.2d at 231; (Tr. 14–15, 17–21, 52–53, 40–41, 148).

The ALJ properly concluded that Smith was not disabled under the Social Security Act and denied his application for supplemental security income, and the court should not disturb that decision. 42 U.S.C. §§ 405(g), 1383(c)(3); *Jones*, 336 F.3d at 476; *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241.

## VI. Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Smith's application for supplemental security income be AFFIRMED.

Dated: November 15, 2018

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).